The opinion of the Court was delivered by
Dtjnkin, Ch.
George street has been, for much more than a century, a public thoroughfare in the City of Charleston. It was originally a part of Ansonborough, and extended from Anson street on the east to Coming street on the west, being of the ’average width of about thirty feet. Some short time anterior to the institution of these proceedings in 1855, it was deemed expedient by the respondents, (The City Council of Charleston,) to widen so much of George street as lies between King and Coming streets, by adding some fifteen feet in width on the north side of George street throughout the above extent. This was accomplished at an expense of twenty-six thousand nine hundred and sixty-three dollars, made up almost exclusively of compensation to the landed proprietors on the north side of the street, whose lands were taken in making the improvement. In May, 1855, the Mayor of the city published a notice to the “ lot-holders in George street,” to attend - a meeting to be held in the City Hall, on 22d May, in order to appoint Commissioners to meet other Commissioners to be appointed by the City Council, “ for the purpose of ascertaining the cost and “ expense of widening said street," and assessing the same “upon the proprietors of lots and houses on both sides of *727 “ said street.” The relators are proprietors or lessees of houses or lots on the south side of George street, between King and Coming streets. Some of these proprietors did not attend the meeting; “ and those who did attend, being ad- “ vised that the City Council had no power or authority to “ levy and collect any assessments upon them for the widen- “ ing of George street, declined to appoint any Commissioners “on their behalf.” On 20th June, 1855, a majority of the Commissioners appointed by the City Council met, and, after ascertaining the whole cost and expense of said improvement, “ assessed the same upon the proprietors of lots and houses upon both sides of the said street.” On 7th July, 1855, the relators were notified by the city treasurer, to pay their respective assessments on or before the 20th day of the same onth : and, in default thereof, executions were lodged with the city sheriff to be levied upon the houses and lots aforesaid, as by law provided. • On 2d November, 1855, this suggestion was filed, and a rule granted to show cause why a writ of prohibition should not issue.
The only question, which it is proposed to consider, is involved in the eighth ground of appeal, to wit: “ Because the “ Act of 1850, and every other Act of the General Assem- “ bly, authorizing the City Council to improve a street, and “assess the expense, or any specific part of the expense “ thereof, on any citizen, or on his land, not required or used “ for such improvement, by Commissioners appointed by “ the said City Council, without his agreement, and to seize. “ and sell his land in default of payment of such assessment'; “is against the law of the land, in derogation of the right'of “trialby jury, and is unconstitutional and void.”
The provisions of the Constitution, on which the reiktors'v rely for protection, are contained in the ninth article. ^By the second section of that article it is declared that “no free-'- “ man of this State shall be taken, or imprisoned, or disseised “ of his freehold, liberties or privileges, or outlawed, or *728 “ exiled, or in any manner destroyed, or deprived of his life, “liberty or property, but by the judgment of his peers, or “ by the law of the land.” The sixth section of the same article provides that “ the trial by jury, as heretofore used in “ this State, shall be forever inviolably preserved.”
It is conceded on both sides that, the assessments were made in the manner, and according to the principles, prescribed by the Act of 1850. It is thereby declared that whenever any street, lane, alley or court, in the City of Charleston, shall have been opened, laid out, extended or established according to the Acts of the General Assembly, &c., the City Council were authorized to appoint six Commissioners to meet an equal number to be appointed by the proprietors of lots fronting on such street, lane, alley or court, and the Commissioners, or a majority of them, after taking an oath, &c., “ shall proceed to ascertain the whole “ cost and expense of said improvement, and to assess the “same upon the proprietors of lots and houses upon both “ sides of such street, lane, court or alley, in due ratio, taking “ into consideration the damages which may be sustained and “ the advantages to be derived therefrom by the said proprie- “ tors respectively.” If the proprietors of lots neglect or refuse to appoint Commissioners, those appointed by the City Council; or a majority of them, are authorized to proceed without them, “ and their judgment in the matter sh^ll be final and conclusive,” except in the case of appeal as provided by said Act.
If any proprietor shall be dissatisfied with the share or proportion assessed upon him, he may appeal to the Court of Common Pleas and General Sessions; and the Court upon satisfactory proof that the appellant has been injured by such assessment, shall order a new assessment, in such particular case, to be made by a jury, who shall be charged therewith, &c. It is further provided that, upon the refusal or neglect to pay such assessments, after ten days notice, the City Coun *729 cil shall be authorized Cl to advertize and sell, according to “ the laws regulating sheriff’s sales, all and every such house “ and houses, lot and lots, on account of which any propor- “ tion of the said assessment may be due.”
Before proceeding to the principal inquiry, it may be proper to notice the provision of this Act giving an appeal to a jury. There are cases in which an individual may be rightfully deprived of his property, or of his liberty, without the intervention of a jury. The Constitution declares that the trial by jury, as heretofore used in this State, •shall be preserved. Rrom time immemorial cases existed in which the liberty of the citizen might be infringed, or his property taken, by a more summary proceeding, or in a forum of which a jury constituted no part. Nor, on the other hand, is an Act of the Assembly, depriving the citizen, of life, liberty, or property, necessarily within the pale of the Constitution, because the party is thereby allowed any qualified or restricted appeal to a jury. The right must be exercised “ as heretofore used,” or the provision is worthless. By the terms of this Act, a party, dissatisfied with the share or proportion assessed upon him, may appeal to the Court, which, if satisfied in the premises, shall order a new assessment to be made by a jury, charged therewith, &c. The right to assess is never submitted to the jury, and forms no part of the matter with which they are to be charged. As well might the jury, in an action of trespass to try title, be instructed that the only inquiry for them was as to the rents and profits, but that the right to the freehold had been determined by an Act of the Legislature, and was not open for their consideration.
To vindicate the Act of 1850, the respondents rely upon •the principle of “ eminent domain.” And it is not now to be questioned in this State, since the case of Manigault vs. Commissioners of Roads, 4 McCord’s R. 541, that the Legislature may order a street to be opened over the lands of an individual, and without making It is a and *730 arbitrary power. “Had this question never been made “ before (said tbe eminent magistrate, who announced tbe “judgment of the Court) I should feel much difficulty in “ forming, and should hesitate long before I expressed, any “ opinion on the subject. The power of taking private pro- “ perty for public uses, without making compensation, is so “much at variance with the established principles of this “ Court, that nothing but the most urgent necessity, or uni- “ versal acquiescence, could have reconciled me to its existence.”, But from the necessity of such power in the-Legislature, from the continued use of it in the passage of such laws prior to the adoption of the Constitution, the Act was held to be no violation of the Constitution. The right ■of the sovereign to appropriate the land of an individual to the purpose of constructing a highway over it without his consent, is referred by civilians to an implied consent of the members, who form a society, to yield up to the sovereign power a portion of their landed property for these great, public conveniences, as a means by which they are connected together from remote and different portions of the same community. In this State this high prerogative of “ eminent domain” has generally been invoked to justify encroachment on the soil of an individual for the purpose of roads either from absolute necessity, or great public convenience.
Although sanctioned by immemorial usage, the exercise of it has always been regarded with jealousy, has been tolerated reluctantly, and should be cautiously restricted within the limits heretofore recognised. The Legislature may authorize a new road to be laid out over the land of A. without his consent, because it is of necessity-a great public accommodation that a thoroughfare should take this direction. They may, too, by the same Act, while taking his freehold against his will, provide for his compensation, as has been done in many instances, and which Chancellor Kent regards as.a necessary attendant upon the just exercise of the power, as *731 well upon principles of “natural equity and as laid down by jurists as an acknowledged principle of universal law.” But it has never yet been maintained that, in order to refund the compensation made By the State to A. for the land thus taken for public use, the Legislature, by virtue of its right of “eminent domain,” could seize and confiscate the lands of B. for the purpose of reimbursing the public treasury the amount paid to A. The prerogative of “ eminent domain” thus exercised finds no precedent in the statute book, and is without sanction from judicial decisions. The Legislature, in the proper exercise of this power, may well have authorized the City Council to encroach on so much of the freehold of the land-owners on the north side of George street as was necessary for the contemplated improvement, but the right of “ eminent domain” gave them no more authority to assess the expense of the improvement upon the land-holders on the south side of George street, than upon the land-holders of Wentworth street, or of East Bay.
Then it is said that the right to levy this assessment upon the relators may be referred to the general power of taxation inherent in every government. No power is more necessary, none more universally recognized, and, it may be added, none the unjust exercise of which has been, in all countries and in all ages, a more fruitful source of complaint and dissatisfaction.
Taxes are collected in a summary manner, and without' an opportunity to the party of being heard. This “ legal process,,(says Judge Nott, in the State vs. Allen, 2 McC. R. 55,) which was originally founded in necessity, has been consecrated by time, &c., must be an exception to the trial by jury and is embraced in the alternative, the law of the land,” as therein defined by him. But in the same case, it was held by the Court that an imposition by the Legislature, by the name of a tax yet wanting its qualities, could not be levied and collected as such without a violation of the *732 constitutional rights of the citizen, and that the Act was null and void. Essential characteristics of any system of taxation (properly so called) are certainty, equality, universality. All the persons or property within a State, district, city, or other fraction of territory having a local sovereignty for the purpose of taxation, should, ás a general rule, constitute the basis for taxation. If the tax be upon real estate, the value of the real estate should be the measure of taxation. As has been elsewhere said, the general rule knows nothing about partial assessment, for benefits, or the selection of a portion of a class. Existence of persons, or the possession of property, and not the supposed 'benefit, are the guide. When each is taxed according to the value of his property, both equality and certainty may be attained to a reasonable extent, but what may be beneficial or otherwise is a matter of opinion, or fancy, or vague conjecture. Thus, for the construction of a bridge, all the tax-payers of the district, may be assessed by the Commissioners, but they have no right to assess the man at the foot of the bridge on one side, whose plantation is on the other side, at any • greater sum than his neighbor who owns a plantation of equal value on the same side of the river with his residence. Such proceeding is at variance with the general principles of taxation, and has no sanction in the usage of the country. Nor will issolated instances of partial or local legislation alter the principle. They may have been passed on the application of the parties themselves, or have been acquiesced in from other causes. An eminent judge says: “ Primá “facie, and upon the face of the Act itself, nothing will “ generally appear to show that the Act is not valid : and it “ is only when some person attempts to resist its operation, “ and calls in the aid of the judicial powers to pronounce it void, as to him, his property, or his rights, that the objec- “ tion of constitutionality can be presented and sustained. ” 16 Pick. 87.
*733 But it is said that, whatever may be the general principle in reference to taxation, the Act of 1850 may be sustained from analogy to the Act of 1764, the provisions of which were substantially incorporated in the City Charter of 1783. These legislative enactments were anterior to the adoption of the Constitution. The decisions in Cruikshanks vs. The City Council, in 1821, and in Yeadon vs. The City Council, in 1828, manifest, at once, the dissatisfaction which has always prevailed in regard to these exceptional proceedings, and the reluctance with which the Court felt bound to sustain them. “ Whatever might have been our opinion” say the Court in the latter case, “ if it were now a new question, we “ do not feel authorized, after the solemn decisions which “have taken place, to interfere further with the subject.”
But the Act of 1764, relates to sewers or drains and sidewallcs, and in both the cases cited, the object was to restrain the City Council, from levying assessments on the relators for drains and foot-pavements. From a very early period sewers and pavements have constituted exceptional subjects in reference to assessments. Statutes of Drains and Sewers were known before the time of Henry YIII. when the general statutes upon she subject were enacted, and the mode of assessment prescribed. In like manner the Act of 1764 provided for assessments for drains or sewers and side walks. Yarious reasons have been assigned for these exceptions. Among others it has been plausibly urged that, as a sanitary regulation, and under the power to abate nuisances, the Corporation might require every citizen to drain his own lot, or in case of neglect, exact a penalty, and so, by the old Act of 1698, (7 Stat. 12,) every inhabitant of Charlestown was required to mend and raise the sidewalk in front of his house in the manner, and to the dimensions therein prescribed, on penalty of forfeiting for each house, a penalty to be collected under the warrant of a justice of the peace. In order the better to carry into effect these objects, and to do *734 what each individual might be required to do for himself, the Act of 1764, authorized the Commissioners of Streets to construct drains and level and pave the footways, &c., and to assess the proprietors of lands and houses fronting on the street, &c. It might be said that this was in ease of the burden theretofore imposed upon each land-holder thus situated. Other, and perhaps better reasons might be assigned for this exceptional legislation. It seems enough to say that the assessments imposed on these relators by the Act of 1850, fall neither within the letter nor the reasons of the Act of 1764. The assessment is neither for drains nor sidewalks. The improvement (so called) is no more beneficial, locally, to the estate of Henry on the south side of George street, which is assessed in the sum of five thousand one hundred and eighty-eight dollars, (nearly one-fifth of the whole cost) than to a land-holder in Coming street, at the head of George street, whose property is not assessed at all. The Act of 1764 carefully preserved the cardinal principle of assessing “rateablyand proportionably to the value of the lands and houses.” The Act of 1850, introduces a new element, and directs the Commissioners, in making the assessment, to “ take into consideration the advantages to be derived from the improvement by the proprietors respectively.”'
According to this, the proprietor of - a humble dwelling on a large lot may be literally improved out of Ms homestead, in consequence of the conjectural advantages derived to his property by the alterations made on Ms opposite neighbor’s freehold under the auspices of the City Council. This Court is of opinion that the proceedings of the respondents derive no authority from any law or usage existing at the adoption of the Constitution, and that the Act of 1850 is in derogation of the rights of the citizen as secured by that instrument.
This opinion cannot be better concluded than in the lan *735 guage of Judge Waties, used more than half a century ago in the case of Lindsay vs. Commissioners, 2 Bay, 61. “ It is “ painful” said he, “ to be obliged to question the exercise “ of any legislative power, but I am sworn to support the “ Constitution, and that is the most important of all the “ duties which are incumbent on the judges. On the faith- “ ful performance of this high duty depends the integrity and “ duration of our government. If the Legislature be per- “ mitted to exercise other rules than those ordained by the “ Constitution, and if innovations are suffered to acquire the “ sanction of time and practice, the rights of the people will “ soon become dependant upon legislative will, and the “ Constitution have no more obligation than an obsolete “law. But if this Court does its duty, in giving to the “ Constitution an overruling operation upon every Act of “the Legislature which is inconsistent with it, the people “ will then have an independent security for their rights, “ which may render them perpetual. In exercising this “ high authority, the judges claim no judicial supremacy: “ they are only the administrators of the public will. If an “ Act of the Legislature is held void, it is not because the “judges have any control over the legislative power, but “because the Act is forbidden by the Constitution, and “ because the will of the people, which is therein declared, “ is paramount to that of their representatives expressed in “ any law.”
The judgment of this Court is that the motion of the relators, in each of the cases, should be granted; that the rule for a prohibition should have been made absolute, and it is now so ordered and adjudged.
Johnstone, Wardlaw and Wardlaw, JJ., and Carroll, Ch., concurred.

Motion granted.